[852 NYS2d 57]

# In the Matter of Lisa Sombrotto, M.D., on Behalf of New-York Presbyterian Medical Center, Payne Whitney Manhattan, Respondent, v Christiana W., Appellant.

First Department, January 31, 2008

## APPEARANCES OF COUNSEL

*Marvin Bernstein*, New York City (*Diane G. Temkin* and *Sadie Zea Ishee* of counsel), for appellant.

*Garfunkel, Wild & Travis, P.C.*, Great Neck (*Eve Green Koopersmith* and *Jason Hsi* of counsel), for respondent.

## OPINION OF THE COURT

NARDELLI, J.

In this appeal, we are asked to determine whether Supreme Court properly granted petitioner hospital's petition to involuntarily administer psychotropic medications to the then 14-year-old respondent over her and her parents' objections, after conducting a hearing to which the parents were not parties.

On December 26, 2006, respondent, who was then 14 years old with no formal psychiatric history, was at the home of a friend when she became upset after her friend's mother began making offensive comments about respondent's mother. Respondent attempted to telephone her mother and, after receiving no response, ran to the bathroom and ingested approximately 15 tabs of amoxicillin and five Motrin. Respondent immediately told her friend to call 911 and, upon her arrival at Lincoln Hospital, she reported to emergency room personnel that she was "stressed," did not want to hurt herself, and regretted her actions. Respondent also informed hospital personnel that she had been in a fight with her mother approximately three months earlier, during which her mother punched her in the head, and that a month prior she had dislocated her mother's shoulder in an altercation. Respondent added that she had dropped out of school two months earlier because she was feeling depressed and was failing classes, and that the New York City Administration for Children's Services (ACS) had an active case file on her. Respondent stated that on this occasion she was unsure whether she had wanted to die or not, but that she had at least intended to harm herself.

Once respondent had been medically cleared by Lincoln Hospital, her mother had her admitted as a voluntary patient to Payne Whitney Manhattan (the Hospital) pursuant to section 9.13 of the Mental Hygiene Law. Respondent's initial progress

reports characterize her mood as, among other things, sad, sullen and depressed, and her behavior as sometimes aggressive and verbally combative, but later reports, including that of February 19, 2007, describe her as "friendly and polite upon approach. She has been social and engaged with peers." The reports also reflect respondent's doctor's wish to begin treatment with various medications and respondent's parents' continuing refusal to consent. As a result, on January 16, 2007, the Hospital converted respondent's admission status to involuntary based upon the certifications of two physicians that she posed a risk to herself and others. Dr. David Rubin, respondent's treating psychiatrist, noted in respondent's medical records that if ACS did not file a medical neglect petition, "further pursuit of [medication over objection] and retention is without purpose as [patient] will be discharged without psychiatric [follow-up] as requested by family that retains custody." ACS, after an investigation conducted at the Hospital's behest, declined to file a neglect petition.

Petitioner, on behalf of the Hospital, on January 23, 2007, commenced the within proceeding by the service of an order to show cause and accompanying petition, seeking an order permitting the involuntary drawing of blood and the involuntary administration of risperidone, lithium and Depakote to respondent. The petition, which was supported by two physician affirmations, including one by Dr. Rubin, alleged that respondent had been diagnosed with "mood disorder, n.o.s. [not otherwise specified]" and named only respondent as a party, but not her parents.

In opposing the petition, Mental Hygiene Legal Service (MHLS), on respondent's behalf, argued, inter alia, that respondent's parents had a fundamental right to determine the appropriate treatment for their daughter and that, if they abused that right, the proper vehicle for redress would be a neglect proceeding in Family Court; that neither the Mental Hygiene Law, nor its implementing regulations, provide for the administration of psychotropic medication to a child over the parents' objection; and that the proceeding brought by the Hospital is unavailable when the child is under 16 years of age and the parents refuse to consent to the treatment. MHLS also sought respondent's release from involuntary hospitalization.

The hearing court, by order entered February 20, 2007, granted the petition in its entirety, finding that "[u]nder New York law parents may not deprive their child of life-saving treat-

ment." The court, however, on March 2, 2007, vacated the February 20 order and declared it a nullity, having determined the necessity of a hearing.

The hearing was thereafter held on March 2, 2007, at the outset of which the parties disagreed over whether the court had jurisdiction, and whether *Rivers v Katz* (67 NY2d 485 [1986]), the case pursuant to which the hearing was purportedly being held, applied to children of respondent's age. The court subsequently determined that it possessed jurisdiction, and proceeded with the hearing, at which the only witness to testify was respondent's treating psychiatrist, Dr. Rubin. Respondent's parents were present but, having not been made parties to the proceeding, declined to testify without the benefit of counsel.

Dr. Rubin opined that respondent's diagnosis was mood disorder, n.o.s., which he described as a "catch-all" diagnosis given to children who have more than depression and show early signs of bipolar disorder, but do not follow the exact adult classification for bipolar disorder. Dr. Rubin noted that there was some possibility that the early treatment with psychotropic medications could prevent the full development of bipolar illness, but that this was "not clear." Dr. Rubin further testified that through the use of behavioral management, respondent's behavior had "absolutely" improved significantly over the course of her hospitalization without medication, and that she was in good behavioral control, was polite with the staff and pleasantly participated in group activities. Dr. Rubin also averred that respondent, while under his care, had not expressed any suicidal ideation and had not made any suicidal gestures, although he nevertheless felt that the administration of psychotropic medication was still necessary due to the fact that respondent felt chronically depressed and that, when under stress, her mood escalated quickly.

It must be noted that petitioner sought permission to involuntarily administrate risperidone, lithium and Depakote to respondent. The "[r]easonable foreseeable adverse" side effects of those medications include: weight gain, a particular concern to respondent, who weighed 208 pounds at the time of her admission; sedation; dystomia (prolonged muscular contractions or rhythmic jerks); akathisia (motor restlessness, inability to sit still); orthostatic hypotension (decrease in blood pressure upon sitting or standing, causing dizziness); tremors; thirst; gastrointestinal upset; increased urination; headache; acne; hypothy-

roidism; cognitive impairment; dizziness; hair loss; and liver function abnormalities.

The hearing court, in an "Amended Decision and Order" entered March 12, 2007, granted the petition and held that despite the "importance of the parents['] rights," "[u]nder New York law parents may not deprive their child of life-enhancing treatment," citing *Matter of Storar* (52 NY2d 363 [1981], *cert denied* 454 US 858 [1981]). The court further found that petitioner had complied with Mental Hygiene Law § 33.21 (e) (2) (iii) in presenting the determination of two doctors that the proposed medications were in respondent's best interests. The court also denied MHLS's application for respondent's release, and directed the parties to "settle order."

The court, by a separate order entered on the same date, reiterated that petitioner was authorized to administer medication over objection, and specified the types and minimum and maximum dosages, and ordered that the medication was only to be administered until respondent exhibited symptomatic relief, and not for more than 30 days.

Initially, we note that the appeal from the purported order denominated an "Amended Decision and Order" is taken from a nonappealable paper inasmuch as the order directed the parties to "settle order" and, accordingly, it should be dismissed (*see* CPLR 5512 [a]).

Moreover, although the minor respondent has been discharged from petitioner hospital, we address the issue of whether the court properly ordered treatment with psychotropic medication over the objection of respondent's parents, as such issue is substantial, likely to recur, and involves a situation capable of evading review (*see Matter of M.B.*, 6 NY3d 437, 447 [2006]; *Matter of Hearst Corp. v Clyne*, 50 NY2d 707, 715 [1980]).

Mental Hygiene Law § 33.21 (b) provides, in pertinent part, that:

> "[i]n providing outpatient mental health services to a minor, or psychotropic medications to a minor residing in a hospital, the important role of the parents or guardians shall be recognized. As clinically appropriate, steps shall be taken to actively involve the parents or guardians, and the consent of such persons shall be required for such treatment in non-emergency situations, except as provided in subdivision[ ] . . . (e) of this section . . . ."

Mental Hygiene Law § 33.21 (e) (1), which is the only paragraph of subdivision (e) which applies to the facts herein, provides that:

> "[s]ubject to the regulations of the commissioner of mental health governing the patient's right to object to treatment, subdivision (b) of this section and paragraph two of this subdivision, the consent of a parent or guardian *or the authorization of a court shall be required* for the non-emergency administration of psychotropic medications to a minor residing in a hospital" (emphasis added).

In *Matter of Weber v Stony Brook Hosp.* (60 NY2d 208, 211-212 [1983], *cert denied* 464 US 1026 [1983]), the Court of Appeals unequivocally stated that:

> "[t]he Legislature, recognizing the primary responsibility of parents concerning the choice of medical care for their child, has made explicit provision for those instances calling for governmental intervention. *Article 10 of the Family Court Act is expressly 'designed to establish procedures to help protect children from injury or mistreatment and to help safeguard their physical, mental, and emotional well-being. It is designed to provide a due process of law for determining when the state, through its family court, may intervene against the wishes of a parent on behalf of a child so that his needs are properly met'* (Family Ct Act, § 1011). The article contains detailed provisions for child protective proceedings" (emphasis added).

Moreover, as this Court has previously opined, it is the prevailing view of the Court of Appeals that the duty of the courts in statutory interpretation is to determine the legislative intent through the examination of all available legitimate sources (*People v Aarons*, 305 AD2d 45, 53 [2003], *affd* 2 NY3d 547 [2004]; *see also People v Rice*, 44 AD3d 247, 253 [2007], *lv denied* 9 NY3d 992 [2007]). Chief Judge Breitel, in *New York State Bankers Assn. v Albright* (38 NY2d 430, 436 [1975]), instructed that the "[a]bsence of facial ambiguity is . . . rarely, if ever, conclusive. The words men use are never absolutely certain in meaning; the limitations of finite man and the even greater limitations of his language see to that. Inquiry into the meaning of statutes is never foreclosed at the threshold . . . ." Judge Breitel, quoting *United States v American Trucking Assns., Inc.*

(310 US 534, 543-544 [1940]), added that "[w]hen aid to construction of the meaning of words, as used in the statute, is available, there certainly can be no 'rule of law' which forbids its use, however clear the words may appear on 'superficial examination' " (*id.* at 437; *see also Riley v County of Broome*, 95 NY2d 455, 463-464 [2000]). In *Matter of ATM One v Landaverde* (2 NY3d 472, 476-477 [2004]), the Court stated,

> "[I]n matters of statutory and regulatory interpretation, we have repeatedly recognized that 'legislative intent is the great and controlling principle, and the proper judicial function is to discern and apply the will of the [enactors]. Generally, inquiry must be made of the spirit and purpose of the legislation, which requires examination of the statutory context of the provision as well as its legislative history' (*Mowczan v Bacon*, 92 NY2d 281, 285 [1998] [internal quotation marks and citations omitted] . . .)."

The legislative history of the subdivision of the Mental Hygiene Law that provides for court intervention (§ 33.21 [e] [1]), and upon which petitioner relies, while sparse, is illuminating. A memorandum from the New York State Office of Mental Health,[1] written in support of the bill, provides, in pertinent part, that:

> "This proposal recognizes the right of a parent or guardian to raise his or her child as the parent or guardian sees fit, yet it also recognizes that such right is not absolute. . . .
>
> "These cases stand for the proposition that a parent's or guardian's decision concerning treatment must yield to the State's interest in promoting the minor's welfare when a parent or guardian *rejects treatment which is in the best interests of his or her child and provides no reasonable alternative treatment.* Accordingly, the conditions precedent proposed in this bill for treatment over the objection of a parent or guardian strike an appropriate

---

1. The New York State Office of Mental Health requested the introduction of the bill in response to the recommendations of the Commission on Quality of Care for the Mentally Disabled in its report, *The Role of Psychotropic Medication in the Treatment of Children in NYS Mental Health Inpatient Settings.*

balance between the interests of a parent or guardian and the State" (Mem of Off of Mental Health, 1994 McKinney's Session Laws of NY, at 2703-2704 [emphasis added]).

Tellingly, the cases cited by the Office of Mental Health in its memorandum are both appeals arising out of neglect proceedings commenced in Family Court (*see Matter of Hofbauer*, 47 NY2d 648 [1979]; *Matter of Sampson*, 37 AD2d 668 [1971], *affd* 29 NY2d 900 [1972]). Indeed, in *Hofbauer*, the Court of Appeals opined that:

> "It surely cannot be disputed that every parent has a fundamental right to rear its child. (*Matter of Bennett v Jeffreys*, 40 NY2d 543, 546; *Quilloin v Walcott*, 434 US 246, 255, reh den 435 US 918.) While this right is not absolute inasmuch as the State, as *parens patriae*, may intervene to ensure that a child's health or welfare is not being seriously jeopardized by a parent's fault or omission (see *Wisconsin v Yoder*, 406 US 205, 233-234; *Prince v Massachusetts*, 321 US 158, 166-167, reh den 321 US 804; *Matter of Vasko*, 238 App Div 128), great deference must be accorded a parent's choice as to the mode of medical treatment to be undertaken and the physician selected to administer the same. As we have only recently stated, '[t]he filial bond is one of the strongest, yet most delicate, and most inviolable of all relationships.' (*Matter of Corey L v Martin L*, 45 NY2d 383, 392.)" (47 NY2d at 655.)

Petitioner, however, apparently undaunted by the due process of law concerns expressed by the Court of Appeals in *Weber* (60 NY2d at 212), the fundamental right of a parent to raise his or her own child, as discussed by the Court of Appeals in *Hofbauer* (47 NY2d at 655), or the importance placed on parental consent as delineated in the Mental Hygiene Law, did not even make respondent's parents parties to this proceeding.[2] Petitioner, in forging ahead with its plan to medicate respondent, also chose

---

2. While Family Court Act § 1013 (a) states that the Family Court has "exclusive original jurisdiction over proceedings . . . alleging the abuse or neglect of a child," and the Court of Appeals stated in *Weber* (60 NY2d at 211, quoting Family Ct Act § 1011) that the Family Court Act is "expressly 'designed to establish procedures to help protect children from injury or mistreatment' " when medical care is at issue, Supreme Court retains jurisdiction pursuant to article VI, § 7 (a) of the New York Constitution as a court of "general original jurisdiction in law and equity" although it is "rarely

to ignore the fact that ACS declined to file a neglect proceeding against respondent's parents after having conducted an investigation at petitioner's insistence, and also chose to ignore the fact that respondent's parents had sought alternative treatment for respondent, which was recognized by ACS during its investigation.

In reaching its determination to grant the petition, the hearing court erred when it relied on Mental Hygiene Law § 33.21 (e) (2) (iii), as that section, by its own terms, applies to minors "sixteen years of age or older," whereas respondent was 14 years of age. The court also erred when it cited to the decision of the Court of Appeals in *Matter of Storar* (52 NY2d 363 [1981], *supra*) for the proposition that "[u]nder New York law parents may not deprive their child of life-enhancing treatment." Indeed, that decision, which was rendered in the context of two incompetent patients who were diagnosed as fatally ill with no reasonable chance of recovery, states that "[t]he parent . . . may not deprive a child *of lifesaving treatment,* however well intentioned . . . Even when the parents' decision to decline necessary treatment is based on constitutional grounds . . . it must yield to the State's interests, as *parens patriae,* in protecting the health and welfare of the child" (*id.* at 380-381 [emphasis added]).

Here, there was no evidence presented whatsoever that respondent was suffering from a life-threatening condition and, in view of the possible side effects of the recommended course of treatment and Dr. Rubin's equivocal testimony regarding whether there would be any long-term life-enhancing benefit, the hearing court's reliance on *Storar* was clearly misplaced. Moreover, the section of the Mental Hygiene Law under which this proceeding arises does not address life-threatening situations and only speaks of the nonemergency administration of psychotropic medications. We conclude, in any event, that petitioner has failed to establish, by clear and convincing evidence, that the administration of psychotropic medication was warranted and, in reaching that conclusion, look to the standard of proof set forth in *Rivers v Katz* (67 NY2d 485, 497-498 [1986], *supra*) regarding the administration of such medications to a minor over the objection of the parents or guardians. Finally, we find that the hearing court's decision to hold the

exercised," as Supreme Court normally defers to Family Court in these matters (Besharov, Practice Commentaries, McKinney's Cons Laws of NY, Book 29A, Family Ct Act § 1013).

hearing without the benefit of respondent's parents as parties renders that hearing constitutionally defective and fatally flawed.

Accordingly, the order of the Supreme Court, New York County (John E.H. Stackhouse, J.), entered March 12, 2007, insofar as it granted the petition of Lisa Sombrotto, M.D., on behalf of New York-Presbyterian Medical Center, Payne Whitney Manhattan, and authorized the drawing of blood from and the administration of medication to respondent, should be reversed, on the law, without costs, and the authorization vacated. The appeal from that part of the order which implicitly upheld petitioner's determination that respondent should continue to be hospitalized involuntarily should be dismissed as moot, without costs. The appeal from the purported order, same court and Justice, entered March 12, 2007, which granted the petition for an order permitting the administration of psychotropic medication to the minor respondent over the objection of respondent's parents, and denied respondent's application for release from involuntary hospitalization, should be dismissed, without costs, as taken from a nonappealable paper.

FRIEDMAN, J.P. (concurring). I concur in the reversal of the order authorizing petitioner to administer psychotropic medication to respondent, a minor, against the wishes of her parents, pursuant to Mental Hygiene Law § 33.21 (e) (1). Even if we were to accept all of petitioner's legal arguments, I believe that it would still be necessary to reverse for lack of sufficient proof upon our review of the facts, as they are set forth in the majority opinion. In my view, petitioner's case fails to meet the standard of proof by clear and convincing evidence that would be required to authorize the forcible administration of psychotropic medication to respondent if she were a nonconsenting adult (see Rivers v Katz, 67 NY2d 485, 497-498 [1986]). At a minimum, a hospital should be required to meet the same high standard of proof set forth in Rivers to obtain authority to administer such medication to a minor over the objection of the parents or guardians, in keeping with the Legislature's recognition of the "important role" of the parents or guardians (Mental Hygiene Law § 33.21 [b]). Further, in view of the Legislature's recognition of the importance of the parents' role, I agree with the majority that the parents should have been formally named as respondents in this proceeding.

In view of the foregoing, I think it unnecessary to address the other arguments made by the parties, except to note that, contrary to respondent's arguments, the granting of the relief sought herein was not precluded under Mental Health Law § 33.21 (e) (1) either by the decision of the child-welfare authorities not to bring a neglect proceeding or by the absence of a life-threatening situation.

MARLOW and CATTERSON, JJ., concur with NARDELLI, J.; FRIEDMAN, J.P., concurs in a separate opinion.

Order, Supreme Court, New York County, entered March 12, 2007, reversed, on the law, without costs, and the authorization to draw blood and administer medication to respondent vacated. Appeal from that part of the order which implicitly upheld petitioner's determination that respondent should continue to be hospitalized involuntarily dismissed as moot, without costs. Appeal from purported order, same court, entered March 12, 2007, dismissed, without costs, as taken from a nonappealable paper.